UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EUGENE J. LONG and YVETTE LONG,<br><br>Plaintiffs,<br><br>vs.<br><br>RUBEN M. BARRETT, ERICH C. HANS, ATHENA MATA, MARIA L. MATA, LOGISTIC OIL LTD, INC., JOHN DOES #1-5,<br><br>Defendants. | Civ. No. 2:17:-cv-5741-KM-SCM<br><br>OPINION |

## KEVIN MCNULTY, U.S.D.J.:

Plaintiffs Eugene J. Long and Yvette Long sue defendants Ruben Barrett, Erich Hans, Athena Mata, Maria Mata, and Logistic Oil regarding a loan agreement. The Longs allegedly lent Athena Mata, Maria Mata, and Logistic Oil $25,000. Barrett, who receives monthly dividends from his tribe, allegedly pledged his monthly dividends as collateral for the loan. Erich Hans, the tribe's Director of Treasury, allegedly agreed to process the assignment of Barrett's dividends for that purpose. The Longs have not been repaid and have not received any dividends by assignment from Barrett. The Complaint asserts claims of breach of contract, unjust enrichment, conversion, breach of fiduciary duty, breach of duty of care, fraud, civil conspiracy, and intentional infliction of emotional distress. Now before the court is the motion of defendant Erich Hans to dismiss for lack of personal jurisdiction, lack of subject matter jurisdiction, and improper venue.

1

## I. BACKGROUND[1]

Plaintiffs Eugene J. Long and Yvette Long ("the Longs") of New Jersey sue defendants regarding a loan agreement. (Compl. ¶¶ 1-2). In around September 2012, defendant Maria Mata sought a loan from the Longs. (Compl. ¶ 19). Maria Mata is a Florida resident and is the actual or beneficial owner of Logistic Oil, Ltd, Inc. ("Logistic Oil") (Compl. ¶¶ 9-10). Maria Mata represented that she needed $25,000 for a short period of time to conduct a series of oil trading transactions expected to result in substantial profits. (Compl. ¶¶ 19-21). Maria Mata stated that the loan would be secured by strong collateral. (Compl. ¶ 21). Athena Mata, the daughter of Maria Mata, is a Florida resident and President of Logistic Oil. She allegedly made the same representations. (Compl. ¶¶ 7-8, 25).

The Longs withdrew Yvette Long's entire IRA account to make the loan to Logistic Oil. (Compl. ¶¶ 23-26). The Longs had no other savings or liquid assets or income besides Social Security. (Compl. ¶ 26). They relied on the promises of Maria, Athena, and Logistic Oil that the money would be returned quickly and that collateral would secure the payment of the principal and dividend. (Compl. ¶¶ 25-26). The Longs needed the loan paid back quickly to avoid taxes and penalties for withdrawing from the IRA account. (Compl. ¶ 25). The Longs represented that they "could not afford to take any risk" with this money. (Compl. ¶ 36).

Defendant Ruben Barrett ("Barrett"), currently a North Carolina resident, agreed to provide the collateral for the loan agreement. (Compl. ¶¶ 3, 28, 30). Barrett is an enrolled member of the Viejas Band of Kumeyaay Indians. (Compl. ¶ 4). The tribe disburses monthly dividend income to tribe members, including

---

[1] The facts are stated with inferences drawn in favor of the plaintiffs on this motion to dismiss. *See* Section II, *infra*. Moreover, a document filed pro se is "to be liberally construed," and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (internal quotation marks omitted).

Citations to the complaint (ECF No. 1) are abbreviated as "Compl."

Barrett, from its casino revenues. (Compl. ¶ 32). Barrett stated that tribe members routinely assign their tribal dividend income as additional collateral for car loans, mortgages, and other credit purchases. (Compl. ¶ 34).

The loan agreement provided that Yvette Long would lend Logistic Oil $25,000. (Compl. ¶ 27). The essential terms of the agreement, documented in a promissory note and escrow agreement, provided the following: (a) full payment of the principal and dividend within 28 days; (b) a $10,000 dividend to Yvette Long; (c) a $10,000 increase in the dividend if the loan were not repaid within 28 days; (d) the loan funds and repayment would flow through the Escrow Agent's trust account; (e) the Escrow Agent would be compensated $5,000 from Logistic Oil; (f) the collateral would be provided by Barrett by the assignment of his monthly tribal income; (g) Barrett was the guarantor of the payments to Yvette Long and the Escrow Agent, Anthony Sposaro; (h) Barrett pledged and assigned $4,017.50 per month from his dividend income to be paid to the Escrow Agent and Yvette Long if the loan defaulted; (i) in case of default, the $5,000 Escrow-Agent fee would reduce Yvette Long's return; and (j) in case of loan default, the Escrow Agent could arrange payment of Barrett's tribal dividend income with the Viejas's Directory of Treasury. (Compl. ¶¶ 28, 30). The loan agreement did not include a default interest rate. (Compl. ¶ 29). A separate agreement provided that Barrett would be compensated $10,000 for providing the collateral. (Compl. ¶ 31).

Erich Hans ("Hans"), a California resident, is the Director of Treasury for the Viejas Band of Kumeyaay Indians. (Compl. ¶¶ 5-6). Barrett and Hans allegedly prepared the assignment that was attached to the Escrow Agreement. (Compl. ¶ 35). Barrett produced a letter from Hans that reported Barrett's monthly tribal income in 2011 and 2012. (Compl. ¶ 38). Barrett also produced an email from Hans stating that Hans would give the Viejas Tribal Council notice of the assignment. (Compl. ¶ 39).

The Longs withdrew $25,000 from Yvette Long's IRA account and deposited it with the Escrow Agent. (Compl. ¶ 40). On October 3, 2012, the

Escrow Agent was in possession of Yvette Long's funds, the signed promissory note, and the signed escrow agreement. (Compl. ¶ 41). Documentation of the assignment of the collateral was provided to Athena Mata, Maria Mata, and Logistic Oil. (Compl. ¶ 41).

Athena Mata, Maria Mata, and Logistic Oil did not repay the loan within 28 days as required by the promissory note. (Compl. ¶ 42). Yvette Long provided a formal notice of default to them in a letter dated February 5, 2013 and provided a copy of the letter to the Escrow Agent. (Compl. ¶ 43). The Escrow Agent then notified Hans of the circumstances and sent Hans instructions for forwarding Barrett's tribal dividend income. (Compl. ¶¶ 44-45).

Hans did not respond to the Escrow Agent and Hans did not forward Barrett's tribal dividend income. (Compl. ¶ 46). Hans did not respond to multiple phone calls and emails from the Escrow Agent. (Compl. ¶¶ 47-48). During this time period, Barrett told the Longs that the payments would be forthcoming soon. (Compl. ¶ 49). Barrett said that Hans had not responded because tribal elections were in process and no one could process the assignment until the new Director of Treasury was appointed. (Compl. ¶ 50). Barrett represented that the payments would be forthcoming by late March. (Compl. ¶¶ 49, 51).

When the Longs did not receive payments in March, Eugene Long called the Viejas Tribal Council. (Compl. ¶ 54). Hans answered the phone and stated that he was still the tribe's Director of Treasury. (Compl. ¶ 54). Hans said no transition had taken place or had ever been planned. (Compl. ¶ 54). Eugene Long asked Hans why he had not responded to the Escrow Agent. (Compl. ¶ 57). Hans replied, "Mr. Barrett told me the matter had been settled." (Compl. ¶ 57). Hans stated that he would contact the Escrow Agent. (Compl. ¶¶ 58-59).

As of April 9, 2013, Hans had not contacted the Escrow Agent. (Compl. ¶¶ 59-60). On that day, Yvette Long called the Viejas Tribal Council and spoke with Hans. (Compl. ¶ 60). On this phone call, Hans stated that he had not received any voluntary garnishment letter from Barrett. (Compl. ¶ 62). Later

that afternoon, Eugene Long sent Hans an email reporting the contents of Yvette Long's conversation with Hans. (Compl. ¶ 63). Eugene Long then called Barrett about this matter, but Barrett stated reasons why he would not pay, including that the guarantee had expired. (Compl. ¶¶ 64-65).

The next day, April 10, 2013, Hans responded to the Longs' email. (Compl. ¶ 66). Long stated, "When I informed Mr. Barrett of the reported default, I asked him if I should initiate the per capita garnishment as indicated in his voluntary garnishment letter. He (Barrett) stated that the reported default was erroneous, and that I was not to initiate the per capita garnishment." (Compl. ¶ 67).

The Longs and the Escrow Agent have not received payment. (Compl. ¶¶ 79-80). Since Yvette Long was not repaid in a timely fashion, she incurred a $10,000 fine from the IRS for withdrawing and not replacing funds in her IRA account. (Compl. ¶ 81). The Longs lost their home in foreclosure and have been unable to pay their bills. (Compl. ¶¶ 82, 85). The default and the accompanying problems have caused the Longs anxiety, depression, strife, and other problems. (Compl. ¶¶ 84, 86).

On August 3, 2017, Eugene and Yvette Long filed a complaint against Barrett, Hans, Logistic Oil, Athena Mata, Maria Mata, and John Does #1-5. (ECF No. 1). The complaint sets forth eight causes of action:

- **Count One:** Breach of Contract (Compl. ¶¶ 87-90)
- **Count Two:** Unjust Enrichment (Compl. ¶¶ 91-95)
- **Count Three:** Conversion (Compl. ¶¶ 96-97)
- **Count Four:** Breach of Fiduciary Duty (Compl. ¶¶ 98-106)
- **Count Five:** Breach of Duty of Care (Compl. ¶¶ 107-114)
- **Count Six:** Fraud (Compl. ¶¶ 115-129)
- **Count Seven:** Civil Conspiracy (Compl. ¶¶ 130-133)
- **Count Eight:** Intentional Infliction of Emotional Distress (Compl. ¶¶ 134-138).

Plaintiffs seek $45,000 due to Yvette Long; $5,000 due to the Escrow Agent; interest on the unpaid sums at the rate of 5% per year from November 1, 2012 onward; an order directing Barrett to complete and perfect the garnishment of his monthly tribal dividend until the debt is paid; punitive damages of $100,000; costs and attorneys' fees; and any other relief the court finds necessary. (Compl. ¶¶ 90, 95, 97, 106, 114, 129, 133, 138).

On October 10, 2017, Hans filed a motion to dismiss for lack of personal jurisdiction, sovereign immunity, and for improper venue. (ECF No. 14). Now before the court is this motion to dismiss. This motion concerns only Hans. It does not address the other defendants—i.e., Athena Mata, Maria Mata, Ruben Barrett, and Logistic Oil.[2]

## II. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

A motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(1) may be raised at any time. *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 437-38 (D.N.J. 1999). Rule 12(b)(1) challenges are either facial or factual attacks. See 2 James Wm. Moore, *Moore's Federal Practice* § 12.30[4] (3d ed. 2007). The defendant may facially challenge subject matter jurisdiction by arguing that the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction. *Iwanowa*, 67 F. Supp. 2d at 438. Under the "facial" 12(b)(1) standard, as under Rule 12(b)(6), the allegations of the complaint are assumed to be true. *Id.*

I construe Hans's arguments for dismissal based on sovereign immunity and qualified immunity as a facial challenge to the complaint's jurisdictional basis. Accordingly, for these purposes the court will take the allegations of the complaint as true. See *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000). The standard of review is thus similar to that which governs a motion to dismiss under Rule 12(b)(6).

---

[2] The Longs have secured a clerk's entry of default against Ruben Barrett, Athena Mata, Maria Mata, and Logistic Oil. (ECF Nos. 7-8, 16, 17, 24).

6

### B. Failure to State a Claim

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trs. Thereof v. Tishman Constr. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

### III. DISCUSSION

Hans seeks to dismiss the action against him by invoking tribal sovereign immunity. He claims that he acted in his capacity as the Director of Finance for the Viejas Band as thus has immunity from suit. (He also claims that this court lacks personal jurisdiction over him and that the District of New Jersey is an improper venue.)

7

### A. Tribal Sovereign Immunity

Sovereign immunity bars any recovery against the tribe. "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) (citations omitted). "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). Tribal waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo*, 523 U.S. at 58-59 (citations omitted). There is no indication that the tribe has waived its sovereign immunity or that Congress has authorized a legal action.

### B. Hans in his Official Capacity

Sovereign immunity also bars recovery against Hans in his official capacity as the tribe's Director of Finance. Tribal sovereign immunity extends to tribal employer in official-capacity suits. *See Lewis v. Clarke*, 137 S. Ct. 1285, 1290-91 (2017). In official-capacity suits, the relief sought is "only nominally against the official and in fact is against the official's office and thus the sovereign itself." *Lewis*, 137 S. Ct. at 1291 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). "The real party in interest is the government entity, not the named official." *Id.* Individual-capacity suits, on the other hand, "seek to impose *individual* liability upon a government official for actions taken under color of state law." *Id.* (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

To determine whether a suit against a tribal officer or employee is an official- or individual-capacity suit, "courts may not simply rely on the characterization of the parties in the complaint, but rather must determine in the first instance whether the remedy sought is truly against the sovereign." *Id.* at 1290.

Sovereign immunity shields Hans from suit in his official capacity. First, this court cannot order Hans to direct money from the tribal treasury to the plaintiffs. That order would directly operate against the tribe as a sovereign.

8

*See Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam) ("The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter."). To direct a tribal officer to take money from the tribe's accounts and direct it to an individual is to order money damages from the tribe. *Cf. Collin v. Comm'r of Soc. Sec.*, 881 F.3d 427 (6th Cir. 2018) (finding that ex-wife's demand that the Commissioner of Social Security direct a lump-sum of her ex-husband's unpaid social security income, outside the context of a specific statutory waiver of sovereign immunity, was a demand for "money damages" from which the United States has immunity). Plaintiffs "cannot circumvent tribal immunity by merely naming officers or employees of the Tribe when the complaint concerns actions taken in defendants' official or representative capacities and the complaint does not allege they acted outside the scope of their authority." *Chayoon v. Chao*, 355 F.3d 141, 143 (2d Cir. 2004).

Second, based on the allegations in the complaint, Hans' conduct was specifically in his role as a tribal officer. Plaintiffs specifically allege that Hans provided Barrett with a letter stating Barrett's monthly tribal dividend, helped prepare a document to facilitate the assignment of Barrett's dividend, and told Barrett that he would notify the Viejas Tribal Council of the assignment. Hans then allegedly failed to forward Barrett's monthly dividend from the tribal treasury to the plaintiffs. These are all official actions that Hans could undertake only as the tribe's Director of Finance. He could not do these tasks as an individual. "[T]ribal officials are immunized from suits brought against them *because of* their official capacities—that is, because of the powers they possess in those capacities enable them to grant the plaintiff relief on behalf of the tribe." *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1296 (10th Cir. 2008); *see also Allen v. Smith*, 597 F. App'x 442, 443 (9th Cir. 2015) (finding that tribal officials cannot be sued for voting to disenroll tribe members). Here, a suit cannot be brought against Hans except for the powers he possessed as the Director of Treasury for the tribe.

### C. Hans in his Individual Capacity

Not all conduct within the scope of tribal employment is covered by sovereign immunity. Courts have held that tribal employees are not immune from individual liability for certain conduct taken within their scope of employment. In *Lewis v. Clarke*, a tribal employee was sued when he allegedly caused a motor-vehicle accident, through his personal negligence, on an interstate highway on non-tribal lands. 137 S. Ct. at 1291. The tribe argued that sovereign immunity barred the suit because he was a tribal employee driving on tribal business and because the tribe's decision to indemnify its employees meant that a judgment would affect the tribe's finances. *Id.* The Supreme Court disagreed: a tribal employee sued in his personal capacity, based on his personal actions not occurring on tribal property, cannot invoke sovereign immunity—even when acting in the scope of his employment. *Id.* The suit "will not require action by the sovereign or disturb the sovereign's property," even if the tribe chooses to indemnify the employee. *Id.* Accordingly, since Hans can, under certain circumstances, incur individual liability for actions taken while a tribal employee, I will consider whether plaintiffs have stated a claim against Hans in his individual capacity.

In this case, the complaint does not allege that Hans engaged in personal conduct beyond his official capacity as Director of Treasury. Even construing this pro se complaint liberally, there are no factual allegations suggesting that Hans engaged in some kind of scheme or course of action outside his official role as a tribal officer. Hans is alleged to have provided Barrett with a letter stating his monthly dividend and communicated, with Barrett, that he would notify the tribal council of the arrangement. (Compl. ¶¶ 38, 39). He allegedly helped prepare a document to facilitate the assignment. (Compl. ¶ 35). Hans then allegedly failed to honor the Longs' request to forward the monthly dividends. (Compl. ¶¶ 46, 48, 56-64, 67-70). These are all actions done in the context of holding tribal office, not in an individual capacity. The complaint states conclusory allegations that Hans "willfully aided Barrett with Barrett's

10

scheme to deceive, hinder and obstruct to deprive [plaintiffs] of monies due" and Hans "colluded and conspired" with Barrett to induce the contract. (Compl. ¶¶ 69-70). These are not factual allegations that give rise to an inference of liability. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556. These allegations do not suggest that Hans breached a contract, enriched himself, converted money, breached a duty owed to the Longs, committed fraud, engaged in a conspiracy, or intentionally inflicted emotional distress. *See* (Compl. ¶¶ 87-138). The allegations suggest at most that Hans acted incorrectly, or contrary to plaintiffs' wishes, in his role as the tribe's Director of Finance.

While a court must accept a complaint's allegations as true at the motion to dismiss stage, mere conclusory statements will not suffice; a complaint must include sufficient factual matter to state a plausible claim. *See Iqbal*, 556 U.S. at 678. This complaint contains mere conclusions of a conspiracy, at least with regard to Hans. As explained in a Tenth Circuit opinion about an alleged conspiracy by a tribal officer,

> Plaintiffs' complaint included nothing upon which a court could conclude such an agreement [to commit a conspiracy] existed—there are no allegations that [the tribal official] acted in concert with [the other defendants]. To the contrary, ... all the allegations made against the Individual Defendants "relate to the decisions made and actions taken by them as the 'principal managers' of [the tribal corporation]," not as individuals. There is simply nothing more than conclusory allegations that a civil conspiracy exists ....

*Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1297-98 (10th Cir. 2008). Without specific factual allegations of actions committed by Hans in his personal capacity, the complaint fails to state a claim.

### D. Declaratory and Injunctive Relief

To the extent that plaintiffs seek declaratory or injunctive relief, sovereign immunity remains a bar. *Ex parte Young* permits federal jurisdiction, despite claims of sovereign immunity, when the suit seeks only prospective injunctive relief in order to "end a continuing violation of federal law." *Seminole*

11

Tribe of Florida v. Florida, 517 U.S. 44, 73 (1996) (citing Green v. Mansour, 474 U.S. 64, 68 (1985)); see also Ex parte Young, 209 U.S. 123 (1908). Plaintiffs do not allege a continuing violation of federal law. Moreover, plaintiffs cannot seek a declaratory judgment ordering that Hans must forward Barrett's tribal dividends to the plaintiffs; that is just a request for damages by another name.

Ultimately, plaintiffs do not state a claim against Hans in his official capacity as the tribe's Director of Treasury and have not made sufficient factual allegations to suggest that he acted in a personal capacity to generate individual liability. Plaintiffs' claims against Hans are thus dismissed. I therefore do not need to evaluate whether this court has personal jurisdiction over Hans or whether this district is a proper venue.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' claims against Hans are dismissed. An appropriate order accompanies this opinion.

Dated: April 3, 2018

**KEVIN MCNULTY**
**United States District Judge**